Lance J. Erickson
Manning & Meyers, Attorneys at Law
4340 North Central Expressway
Dallas, Texas 75206
(214) 823-6600  fax (214) 821-3800
lance@lawyeranddefender.com
Attorney for Holland Estates Homeowners' Association, Inc.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | § | <u>CAUSE NO. 16-42573</u> |
| Mr. Rafael Pulido & | § | |
| Mrs. Felicia Marie Rocha a/k/a Felicia Pulido | § | |
| | § | |
| Debtors. | § | CHAPTER 13 |

## <u>MOTION FOR RELIEF FROM AUTOMATIC STAY AGAINST MR. RAFAEL PULIDO & MRS. FELICIA MARIE ROCHA A/K/A FELICIA PULIDO, WAIVER OF 30-DAY HEARING REQUIREMENT, AND REQUEST FOR HEARING</u>

TO: THE HONORABLE JUDGE OF THE UNITED STATES BANKRUPTCY COURT

### <u>NOTICE OF LOCAL RULE 4001(b)</u>

PERSUANT TO LOCAL BANKRUPTCY RULE 4001-1(A), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.

NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MANNER.

COMES NOW, Holland Estates Homeowners' Association, Inc., the "Movant," a secured creditor in the above-entitled and numbered case, and files this, their Motion To Lift Automatic Stay pursuant to Section 362 of the Bankruptcy Code and in support thereof would respectfully show the Court the following:

## I. JURISDICTION

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

2.  The matters raised in this Motion constitute core proceedings within the meaning of 28 U.S.C. §157(b)(2)(G).

3.  Venue of these proceedings is proper in this Court pursuant to 28 U.S.C. § 1409.

## II. FACTS

4.  Mr. Rafael Pulido & Mrs. Felicia Marie Rocha a/k/a Felicia Pulido filed a voluntary Chapter 13 case on 7/1/2016.

5.  Mr. Rafael Pulido & Mrs. Felicia Marie Rocha a/k/a Felicia Pulido are the record title holders to the real property, with all improvements thereon, located at 4005 Alamo Drive, Mansfield, TX 76063, and thus are members of Holland Estates Homeowners' Association, Inc.. Said property is more particularly described as follows:

> Lot 9, Block 1, of Holland Estates, an Addition to the City of Mansfield, Tarrant County, Texas, according to the Map or Plat thereof recorded in Cabinet A, Slide 6428, Plat Records, Tarrant County, Texas; and
>
> Also known as:
>
> 4005 Alamo Drive, Mansfield, TX 76063, (hereinafter "the Property")

6.  The Property is burdened by, among other things, the Declaration of Covenants, Conditions and Restrictions for Holland Estates Homeowners' Association, Inc., executed by Gerault Road, Inc., a Texas corporatin and it's general partner, as Declarant, and recorded on or about July 20, 2001, at

Instrument Number D201169834 in the Real Property Records of Tarrant County, Texas, including any amendment thereof and supplements thereto and entitled "Declaration of Covenants, Conditions, and Restrictions for Holland Estates" (hereinafter "Declaration").

Mr. Rafael Pulido & Mrs. Felicia Marie Rocha a/k/a Felicia Pulido, by accepting a deed to the property, whether or not it was so expressed in such deed or other conveyance, is deemed to covenant and agree to pay to Holland Estates Homeowners' Association, Inc. certain assessments together with late fees, interest, costs and reasonable attorney's fees.   These assessments are levied by the Association and are used, in part, to provide for normal recurring maintenance charges for the Common Properties, as well as improvements to the Common Properties, which are for the use and benefit of all members of the Association as well as other expenses determined by Holland Estates Homeowners' Association, Inc. Board of Directors to benefit the Association as a whole.

7.   The assessments and certain charges are also secured by a Lien in favor of the Association against each property.  The power to charge assessments is set forth in Article 2, Section 2.6, of the Declaration which states in pertinent part as follows:

> 2.6 Funding.
>
> Subject to the terms of this Article, Declarant, for each Lot owned by Declarant, hereby covenants to pay, and each Owner of any Lot by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, covenants and agrees to pay to the Association: (1) annual assessment or charges, and (2) special assessments for capital improvements, such· assessments to be established· and collected as hereinafter provided. Such assessments will remain effective for the full term (and extended term, if applicable) of this Declaration. The annual and special assessments, together with interest costs, and reasonable attorney's fees, shall be a charge on the land and shall be a continuing lien upon the Lot against which each such assessment is made. However, such liens are and shall be subordinated pursuant to and as provided in Article II Section 9 hereof. Each such assessment, together with interest, costs, and reasonable attorney's fees shall also be the personal obligation of the person who was the Owner of such Lot at the time the assessment fell due. The personal obligation for delinquent assessments shall not pass to the successors in title of such Owner unless expressly assumed by them.

A copy of said Declaration is attached to this Motion as "Exhibit A" and incorporated by reference.

8.  The Debtors are in default on their obligation to Movant in that Debtors have failed to make their Post-Bankruptcy Assessment payments when due and owing pursuant to the terms of the above described declaration.

9.  Debtors were in default in the amount of $7,358.00 at the time of the bankruptcy filing.

10.  Debtors have failed to make Post Bankruptcy Assessment payments.  Debtors owe $1,625.00 in Post-Bankruptcy Assessment Payments as of the time of the filing of this motion.  This amount includes other charges incurred on behalf of Movant in relation to this bankruptcy action and in relation to fines, fees, and charges in relation to the Debtors' account.

*11.* Article 2, Section 2.8 and Section 2.9, of the Declaration provides that in the event of non-payment by any Owner of any assessments or allowed charge, the Movant may enforce non-payment by the foreclosure of the Debtor's Property or institute suit against the Debtor as they are personally obligated to pay the assessment.  Article 2, Section 2.8 and Section 2.9, of the Declaration, states in pertinent part as follows:

*2.8 Nonpayment of Assessments:*

*Remedies of the Association. Any assessment not paid within ten (10) days after the due date shall bear interest from due date at the highest non-usurious rate of interest allowed by Texas law or 18% per annum, whichever is less. The Association shall have the authority to impose late charges to compensate for the administrative and processing costs of late payments on such terms as it may establish by duly adopted resolutions and the Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien retained herein against the Property. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of the Common Maintenance Area or abandonment of his property.*

*2.9 Subordinated Lien to Secure Payment:*

*To secure the payment of the maintenance charge and assessment established hereby and to be levied on individual Lots as above provided, there is hereby reserved a lien for the benefit of the Association, and said lien to be enforceable through appropriate proceedings at law or in equity by such beneficiary; provided, however, that each such lien shall be' specifically made secondary, subordinate, and inferior to all liens, present and future, given, granted, and created by or at the insistence and request of the Owner (including the Declarant) of any such Lot (or any portion of the Property) to secure the payment of monies advanced or to be advanced on account of the purchase price and/or the improvement of any such Lot or any portion of the Property including specifically any monies advanced under a development Loan for the development of the Property into residential lots; and further provided that as a*

*condition precedent to any proceeding to enforce such lien upon any Lot (or any, portion of the Property) upon which there is an outstanding, valid, and subsisting first mortgage lien, said beneficiary shall give the holder of such first mortgage sixty (60) days written notice of such proposed action, such notice shall be sent to the nearest office of the lienholder by prepaid U.S. registered mail, containing the statement of the delinquent maintenance charges upon which the proposed action is based. Upon the request of any such first mortgage lienholder, the beneficiary shall acknowledge in writing its obligation to give the foregoing notice with respect to the particular property covered by such first mortgage lien to the holder thereof. Sale or transfer of a Lot shall not affect the assessment lien. However, the sale or transfer of any Lot pursuant to mortgage foreclosure shall extinguish the lien of such assessment as to payments which became due prior to such sale or transfer. No sale, foreclosure, or transfer shall relieve such Lot from liability for any assessments thereafter becoming due or from the lien thereof. The Association shall have the right to file notices of liens in favor of the Association in the official records of Tarrant County, Texas.*

12. By failing to make the regular Post-Petition assessment payments pursuant to the Declaration, Debtors have not provided adequate protection to Movant. The plan provides that the Debtors shall make adequate protection in the form of ongoing monthly payments paid directly to Movant. Debtors' delinquency indicates either a willful non-compliance with the plan or an inability to meet the terms of the plan. As such, causes exist for the lifting of the stay.

13. Movant has no remedy available to it other than to seek relief from the automatic stay.

14. Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorney's fees for which it is entitled and to reimbursement under the terms of the Declaration.

### III. RELIEF REQUESTED

15. Movant request that the Court lift the stay for cause and for lack of adequate protection pursuant to 11 U.S.C. § 362(d)(1) in order to allow them to proceed to foreclose their lien against the Property.

16. Alternatively, Movant requests that the Court lift the stay pursuant to 11 U.S.C. §362(d)(2) because the Property is not needed for an effective reorganization.

17. Movant requests that they be granted reasonable attorneys' fees in the amount of $700.00 for filing and prosecuting this Motion.

18. Movant requests that the provision of Fed. R. Bankr. P. 4001(a)(3) be waived and that Movant be permitted to immediately enforce and implement any order lifting the automatic stay.

### IV. PRAYER

WHEREFORE PREMISES CONSIDERED, Movant prays for an order lifting the automatic stay to permit Movant to foreclose and gain possession of the Real Property and for such other relief to which the Movant may be justly entitled.

RESPECTFULLY SUBMITTED,

   /s/ Lance J. Erickson
Lance J. Erickson, Manning & Meyers, Attorneys at Law
SB#24072509
4340 North Central Expressway
Dallas, Texas 75206
(214) 823-6600  fax (214) 821-3800
lance@lawyeranddefender.com
Attorney for Holland Estates Homeowners' Association, Inc.

### CERTIFICATE OF CONFERENCE

I hereby certify that on August 9, 2018, our office called the offices of Mr. Christopher Marvin Lee, Lee Law Firm, PLLC, attorney for the Debtor regarding this motion. Debtors' counsel is opposed to the filing of this Motion.

   /s/ Lance J. Erickson
Lance J. Erickson
Attorney for Holland Estates Homeowners' Association, Inc.

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Motion of Holland Estates Homeowners' Association, Inc. to Lift Stay was served via electronic means on August 9, 2018, upon the following:

_/s/ Lance J. Erickson_
Lance J. Erickson
Attorney for Holland Estates Homeowners' Association, Inc.

| | |
|---|---|
| United States Trustee | Debtors' attorney |
| Tim Truman | Mr. Christopher Marvin Lee |
| Northern Bankruptcy District | Lee Law Firm, PLLC |
| 6851 N.E. Loop 820 | 4228 N. Central Expressway, Suite 320 |
| Suite 300 | Dallas, TX 75206 |
| North Richland Hills, TX 76180 | |

All Parties who have filed a Notice of Appearance.

# Exhibit A

## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS

### FOR HOLLAND ESTATES



THIS DECLARATION is made on the date hereinafter set forth by HOLLAND ESTATES LTD., a Texas limited partnership, hereinafter referred to as the "Declarant."

### WITNESSETH

WHEREAS, the Declarant is the owner of certain real property in the City of Mansfield, Tarrant County, Texas, which is described in Exhibit "A" attached hereto and made a part hereof (the "Property").

WHEREAS, Declarant desires to create an exclusive planned community known as Holland Estates on the Property and such other land as may be added thereto pursuant to the terms and provisions of this Declaration;

NOW THEREFORE, the Declarant declares that the Property described shall be held, sold and conveyed subject to the restrictions, covenants and conditions, which shall be deemed to be covenants running with the land and imposed on and intended to benefit and burden each Lot and other portions of the Property in order to maintain within the Property a planned community of high standards. Such covenants shall be binding on all parties having any right, title or interest therein or any party thereof, their respective heirs, personal representatives, successors and assigns, and shall inure to the benefit of each Owner thereof.

1

# ARTICLE 1.

## DEFINITIONS

1.1     **"Association"** shall mean and refer to the Holland Estates Homeowners' Association, Inc., a Texas not-for-profit corporation established for the purpose set forth herein, its successor and assigns.

1.2     **"Board"** shall mean and refer to the Board of Directors of the Association.

1.3     **"Common Areas"** shall mean and refer to that portion of the Property, if any, conveyed to the Association for the use and benefit of the Owners as well as any other areas of land, improvements or other property rights within the Property which are known, described or designated or which shall subsequently become known, described or designated as Common Areas intended for or devoted to the common use and enjoyment of the Owners, together with any and all improvements that are now or may hereafter be constructed thereon.

1.4     **"Common Maintenance Areas"** shall mean and refer to the Common Areas, if any, and the entrance monuments, drainage facilities, detention ponds, right-of-ways, landscaping, and such other areas lying within dedicated public easements or right-of-ways as deemed appropriate by the Board for the preservation, protection and enhancement of the property values and the general health, safety and welfare of the Owners.

1.5     **"Declarant"** shall mean and refer to Holland/Man, Ltd., its successors and assigns who are designated as such in writing by the Declarant, and who consent in writing to assume the duties and obligations of the Declarant with respect to the Lots acquired by

2

such successor and/or assign.

1.6 **"Declaration"** shall mean and refer to this Declaration of Covenants, Conditions and Restrictions for Holland Estates and any amendments, annexations and supplements thereto made in accordance with its terms.

1.7 **"Home," "Dwelling" or "Residence"** shall mean and refer to any residential unit, situated upon any Lot, including the parking garage utilized in connection therewith and the Lot upon which the Home, Dwelling or Residence is located.

1.8 **"Lienholder" or "Mortgagee"** shall mean the holder of a first mortgage lien, either on any Home and/or any Lot.

1.9 **"Lot"** shall mean and refer to that portion of the Property consisting of 41.866 acres of land located in Mansfield, Tarrant County, Texas, comprising one hundred Sixty One (161) Lots with the exception of the Common Areas and areas deeded to a governmental authority or utility, together with all improvements thereon.

1.10 **"Member"** shall mean and refer to every person or entity who holds membership in the Association. The Declarant and each Owner shall be a Member in the Association.

1.11 **"Owner"** shall mean and refer to the record owner, including the Declarant, whether one (1) or more persons or entities, of the fee simple title to any Lot, including the home builder, but shall exclude those having an interest, merely as security for the performance of an obligation. However, the term "Owner" shall include any lienholder or mortgagee who acquires fee simple title to any Lot which is part of the Property, through

3

--

deed in lieu of foreclosure or through judicial or nonjudicial foreclosure.

1.12  **"Property," "Premises" or "Development"** shall mean and refer to the real property described in Exhibit "A," known as Holland Estates and such additions thereto as may be brought within the jurisdiction of the Association and be made subject to this Declaration.

1.13  **"City"** shall mean and refer to the City of Mansfield, Tarrant County, Texas.

**ARTICLE 2.**

**Holland Estates**

**HOMEOWNERS' ASSOCIATION**

2.1  **Establishment of Association.** The formal establishment of the Holland Estates Homeowners' Association will be accomplished by the filing of the Articles of Incorporation of the Holland Estates Homeowners' Association with the Secretary of State for the State of Texas and the subsequent issuance by the Secretary of State of the Certificate of Incorporation of the Holland Estates Homeowners' Association.

2.2  **Adoption of By-Laws.** Bylaws for the Holland Estates Homeowners' Association will be established and adopted by the Board.

2.3  **Membership.** The Declarant and every other Owner of a Lot, including any successive buyer(s), shall automatically and mandatorily become a member of the Association. Membership shall be appurtenant to and shall not be separated from ownership of any Lot. Every member shall have the right at all reasonable times during business hours to inspect the books of the Association.

4

2.4   **Voting Rights.**   The Association shall have two (2) classes of voting membership:

(a)   **Class A.**   Class A Members shall be all Owners, except Declarant, and shall be entitled to one (1) vote for each Lot owned. When more than one person holds an interest in any Lot, all such persons shall be members, but the vote for such Lot shall be exercised as they among themselves determine, and in no event shall more than one (1) vote be cast with respect to any Lot.

(b)   **Class B.**   The Class B Member shall be the Declarant who shall be entitled to five (5) votes for each unoccupied Lot it owns. The Class B membership shall cease and terminate upon the conveyance by Declarant of the last Lot owned by the Declarant.

(c)   **Suspension.**   All voting rights of an Owner shall be suspended during any period in which such Owner is delinquent in payment of any assessment duly established pursuant to this Article or is otherwise in default hereunder or under the By-Laws or rules and regulations of the Association and such suspension shall apply to the proxy authority of the voting representative, if any.

(d)   **No Cumulative Voting.**   At all Association meetings there shall be no cumulative voting. Prior to all meetings, the Board shall determine the total number of votes outstanding and the Members entitled to vote.

2.5   **Notice and Quorum.**   Written notice of any meeting called for the purpose of taking any action authorized herein shall be sent to all Members, or delivered to their Residences, not less than fifteen (15) days nor more than sixty (60) days in advance of the

5

--

meeting. At any such meeting called, the presence of Members or of proxies of voting representatives entitled to cast two-thirds (2/3) of the votes of the Association shall constitute a quorum. If the required quorum is not present, another meeting may be called subject to the same notice requirement, and the required quorum at such subsequent meeting shall be two-thirds (2/3) of the quorum requirement for such prior meeting. The Association may call as many subsequent meetings as may be required to achieve a quorum (the quorum requirement being reduced for each such meeting). No such subsequent meeting shall be held more than sixty (60) days following the preceding meeting.

2.6     **Funding.** Subject to the terms of this Article, Declarant, for each Lot owned by Declarant, hereby covenants to pay, and each Owner of any Lot by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, covenants and agrees to pay to the Association: (l) annual assessment or charges, and (2) special assessments for capital improvements, such assessments to be established and collected as hereinafter provided. Such assessments will remain effective for the full term (and extended term, if applicable) of this Declaration. The annual and special assessments, together with interest, costs, and reasonable attorney's fees, shall be a charge on the land and shall be a continuing lien upon the Lot against which each such assessment is made. However, such liens are and shall be subordinated pursuant to and as provided in Article II Section 9 hereof. Each such assessment, together with interest, costs, and reasonable attorney's fees shall also be the personal obligation of the person who was the Owner of such Lot at the time the assessment fell due. The personal obligation for delinquent assessments shall

6

not pass to the successors in title of such Owner unless expressly assumed by them.

2.7 **Assessments.**

(a) **Lots Owned by Class A Members.** Subject to the terms of this Article, each Lot is hereby subject to an initial maximum maintenance charge of $30.00 per month or $360.00 per annum (until such maintenance charge shall be increased or decreased by the Board) for the purpose of creating a fund to be designated and known as the "maintenance fund," which maintenance charge and assessment will be paid by the Owner or Owners of each Lot in advance in monthly, quarterly, semi-annual or annual installments, commencing as to all Lots upon the establishment of the Association pursuant to Section 1 of Article 2 hereof. The rate at which each Lot will be assessed, and whether such assessment shall be payable monthly, quarterly, semi-annually or annually, will be determined by the Board at least thirty (30) days in advance of each affected assessment period. Said rate may be increased or decreased from time to time by the Board as the needs of the Association may, in the judgment of the Board, require. The assessment for each Lot shall be uniform. The Association shall, upon written demand and for a reasonable charge, furnish a certificate signed by an officer of the Association setting forth whether or not the assessment has been paid for the assessment period.

(b) **Lots Owned by Declarant.** So long as there is a Class B membership as set forth in subsection (b), Section 4 of Article 2, the Declarant shall pay the same assessment per Lot charged to other Owners for each Lot owned by Declarant.

(c) **Purpose of Maintenance Fund.** The Association shall establish a maintenance fund composed of Owners' annual maintenance assessments and shall use

7

--

the proceeds of such fund in providing for normal, recurring maintenance charges for the Common Maintenance Areas for the use and benefit of all Members of the Association. Such uses and benefits to be provided by the Association may include, by way of clarification and not limitation, any and all of the following: normal, recurring maintenance of the Common Maintenance Areas (including, but not limited to mowing, edging, watering, clipping, sweeping, pruning, raking, and otherwise caring for and replacing landscaping) and the improvements to such Common Maintenance Areas, such as sprinkler systems, and private streets, if any, provided the Association shall have no obligation (except as expressly provided hereinafter) to make capital improvements to the Common Maintenance Areas; payment of all legal and other expenses incurred in connection with the enforcement of all recorded covenants, restrictions, and conditions affecting the property to which the maintenance fund applies; payment of all reasonable and necessary expenses in connection with the employment of security guards or watchmen, if any, caring for vacant lots; and any other necessary or desirable act, in the opinion of the Board, to keep the Property neat and in good order, or which is considered of general benefit to the Owners or occupants of the Property, it being understood that the judgment of the Board in the expenditure of said funds and the determination of what constitutes normal, recurring maintenance shall be final and conclusive so long as such judgment is exercised in good faith. The Association shall, in addition, establish and maintain an adequate reserve fund to ensure the continuous and perpetual use, operation, maintenance, and/or supervision of all facilities, structures, improvements, systems, areas or grounds that are the Association's responsibility. The reserve fund shall be established and maintained out of regular annual

8

assessments.

(d)     **Special Assessment for Working Capital Fund, Nonrecurring Maintenance and Capital Improvements.**     In addition to the annual assessments authorized above, the Association may levy special assessments for the purpose of defraying, in whole or in part, the cost of any nonrecurring maintenance, or the acquisition, construction, reconstruction, repair, or replacement of a capital improvement upon any Common Maintenance Area, including fixtures and personal property related thereto, may be assessed. The Association shall not commingle the proceeds of such special assessment with the maintenance fund. Such proceeds shall be used solely and exclusively to fund the nonrecurring maintenance or improvements in question.

2.8     **Nonpayment of Assessments: Remedies of the Association.**     Any assessment not paid within ten (10) days after the due date shall bear interest from due date at the highest non-usurious rate of interest allowed by Texas law or 18% per annum, whichever is less.   The Association shall have the authority to impose late charges to compensate for the administrative and processing costs of late payments on such terms as it may establish by duly adopted resolutions and the Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the lien retained herein against the Property.   No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of the Common Maintenance Area or abandonment of his property.

2.9     **Subordinated Lien to Secure Payment.** To secure the payment of the maintenance charge and assessment established hereby and to be levied

9

on individual Lots as above provided, there is hereby reserved a lien for the benefit of the Association, said lien to be enforceable through appropriate proceedings at law or in equity by such beneficiary; provided, however, that each such lien shall be specifically made secondary, subordinate, and inferior to all liens, present and future, given, granted, and created by or at the insistence and request of the Owner (including the Declarant) of any such Lot (or any portion of the Property) to secure the payment of monies advanced or to be advanced on account of the purchase price and/or the improvement of any such Lot or any portion of the Property including specifically any monies advanced under a development loan for the development of the Property into residential lots; and further provided that as a condition precedent to any proceeding to enforce such lien upon any Lot (or any portion of the Property) upon which there is an outstanding, valid, and subsisting first mortgage lien, said beneficiary shall give the holder of such first mortgage sixty (60) days written notice of such proposed action, such notice shall be sent to the nearest office of the lienholder by prepaid U.S. registered mail, containing the statement of the delinquent maintenance charges upon which the proposed action is based. Upon the request of any such first mortgage lienholder, the beneficiary shall acknowledge in writing its obligation to give the foregoing notice with respect to the particular property covered by such first mortgage lien to the holder thereof. Sale or transfer of a Lot shall not affect the assessment lien. However, the sale or transfer of any Lot pursuant to mortgage foreclosure shall extinguish the lien of such assessment as to payments which became due prior to such sale or transfer. No sale, foreclosure, or transfer shall relieve such Lot from liability for any assessments thereafter becoming due or from the lien thereof. The Association shall have

10

the right to file notices of liens in favor of the Association in the official records of Tarrant County, Texas.

## ARTICLE 3.

## GENERAL POWERS AND DUTIES OF THE

## BOARD OF DIRECTORS OF THE ASSOCIATION

3.1 **Purpose of Maintenance Fund.** The Board, for the benefit of the Owners, shall provide and shall pay out of the maintenance fund provided in Article 2 above, the following:

(a) Taxes and assessments, and other liens and encumbrances which shall properly be assessed or charged against the Common Areas rather than against the individual Owners, if any.

(b) Operation, maintenance and supervision of the Common Maintenance Area.

(c) The services of a professional person or management firm to manage the Association or any separate portion thereof to the extent deemed advisable by the Board (provided that any contract for management of the Association shall be terminable by the Association, with no penalty, upon ninety (90) days prior written notice to the managing

11

--

party) and the services of such other personnel as the Board shall determine to be necessary or proper for the operation of the Association, whether such personnel are employed directly by the Board or by the manager.

(d) Legal and accounting services.

(e) A policy or policies of insurance insuring the Association against any liability to the public or to the Owners (and/or invitees or tenants) incident to the operation of the Association in any amount or amounts as determined by the Board, including a policy or policies of insurance as provided herein in Article 4.

(f) Workers compensation insurance to the extent necessary to comply with any applicable laws.

(g) Such fidelity bonds as may be required by the By-Laws or as the Board may determine to be advisable.

(h) Any other materials, supplies, insurance, furniture, labor, services, maintenance, repairs, structural alterations, taxes, or assessments (including taxes or assessments assessed against an individual Owner) which the Board is required to obtain or pay for pursuant to the terms of this Declaration or by law or which in its opinion shall be necessary or proper for the enforcement of this Declaration.

3.2    **Powers and Duties of Board.** The Board, for the benefit of the Owners, shall have the following general powers and duties, in addition to the specific powers and duties provided for herein and in the By-Laws of the Association:

(a) To execute all declarations of ownership for tax assessment purposes with regard to the Common Areas, if any, on behalf of all Owners.

12

(b)     To borrow funds to pay costs of operation secured by assignment or pledge of rights against delinquent Owners if the Board sees fit.

(c)     To enter into contracts, maintain one or more bank accounts, and generally to have all the power necessary or incidental to the operation and management of the Association.

(d)     To protect or defend the Common Areas from loss or damage by suit or otherwise and to provide adequate reserves for replacements.

(e)     To make reasonable rules and regulations for the operation of the Common Maintenance Areas including Pool and Cabana Areas and to amend them from time to time; provided that, any rule or regulation may be amended or repealed by an instrument in writing signed by Owners constituting a majority of the votes of the Association, or with respect to a rule applicable to less than all of the Common Areas, by a majority of the votes of the Owners in the portions affected.  However, the Association's agreements, covenants and restrictions pertaining to the use, operation, maintenance and/or supervision of any facilities, structures, improvements, systems, areas or grounds that are the Association's responsibility, may not be amended without the prior written consent of the City.

(f)     To make available for inspection by Owners within sixty (60) days after the end of each year an annual report and to make all books and records of the Association available for inspection by Owners at reasonable times and intervals.

(g)     To adjust the amount, collect and use any insurance proceeds to repair damage or replace lost property, and if proceeds are insufficient to repair damage or

replace lost property, to assess the Owners in proportionate amounts to cover the deficiency.

(h)     To enforce the provisions of any rules, covenants, conditions and restrictions made hereunder and to enjoin and seek damages from any Owner for violation of such covenants, conditions, restrictions or rules.

(i)     To collect all assessments and enforce all penalties for non-payment including the filing of liens and institution of legal proceedings.

3.3     **Board Powers Exclusive.**  The Board shall have the exclusive right to contract for all goods, services and insurance, payment of which is to be made from the Maintenance Fund and the exclusive right and obligation to perform the functions of the Board except as otherwise provided herein.

3.4     **Maintenance Contracts.**  The Board, on behalf of the Association, shall have full power and authority to contract with any Owner or other person or entity for the performance by the Association of services which the Board is not otherwise required to perform pursuant to the terms hereof, such contracts to be upon such terms and conditions and for such consideration as the Board may deem proper, advisable and in the best interest of the Association.

## ARTICLE 4.

### TITLE TO COMMON AREAS

4.1     **Association to Hold.**  The Association shall assume all maintenance obligations with respect to any Common Areas which may be hereafter established.

14

--

Nothing contained herein shall create an obligation on the part of Declarant to establish any Common Area.

Prior to the establishment of the Association, Declarant shall hold title to Common Areas.

4.2 **Liability Insurance.** From and after the date on which title to any Common Area vests in the Association, the Association shall purchase and carry a general comprehensive public liability insurance policy for the benefit of the Association and its Members, covering occurrences on the Common Areas. The policy limits shall be as determined by the Board. The Association shall use its best efforts to see that such policy shall contain, if available, cross-liability endorsements or other appropriate provisions for the benefit of the Members, Board, and the management company and other insureds, as their interests may be determined.

4.3 **Condemnation.** In the event of condemnation or a sale in lieu thereof of all or any portion of the Common Areas, the funds payable with respect thereto shall be payable to the Association and shall be used by the Association to purchase additional Common Areas to replace that which has been condemned or to take whatever steps that it deems reasonably necessary to repair or correct any damage suffered as a result of the condemnation. In the event that the Board determines that the funds cannot be used in such a manner due to lack of available land for additional Common Areas or for whatever reason, any remaining funds may be utilized by the Association for the general maintenance fund.

15

## ARTICLE 5.

## EASEMENTS

5.1    **Utility Easements.**  As long as Class B membership shall be in effect, the Declarant hereby reserves the right to grant perpetual, nonexclusive easements for the benefit of the Declarant or its designees, upon, across, over, through and under any portion of the Common Area or any portion of any Lot outside of the permitted building area of such Lot, for ingress, egress, installation, replacement, repair, maintenance, use and operation of all utility and service lines and service systems, public and private, including, without limitation, cable television. Declarant, for itself and its designee, reserves the right to retain title to any such easements.  Upon cessation of Class B membership, the Association shall have the right to grant the easements described herein.

5.2    **Declarant's Easement to Correct Drainage.**  Declarant hereby reserves a blanket easement on, over and under the ground within the Property to maintain and correct drainage of surface waters and implement other erosion controls in order to maintain reasonable standards of health, safety, and appearance and shall be entitled to remove trees or vegetation, without liability for replacement or damage, as may be necessary to provide adequate drainage for any portion of the Property.  Notwithstanding the foregoing, nothing herein shall be interpreted to impose any duty upon Declarant to correct or maintain any drainage facilities within the Property.

5.3    **Easement for Unintentional Encroachment.**    The Declarant hereby

16

--

reserves an exclusive easement for the unintentional encroachment by any structure upon the Common Area caused by or resulting from, construction, repair, shifting, settlement or movement of any portion of the Property, which exclusive easement shall exist at all times during the continuance of such encroachment as an easement appurtenant to the encroaching property to the extent of such encroachment.

5.4 **Entry Easement.** In the event that the Owner fails to maintain the Lot as required herein, or in the event of emergency repairs and to do the work reasonably necessary for the proper maintenance and operation of the Property, entry upon the Lot as provided herein shall not be deemed a trespass, and the Association shall not be liable for any damage so created unless such damage is caused by the Association's willful misconduct or gross negligence.

5.5 **Drainage Easements.** Easements for the installation and maintenance of utilities, storm water retention/detention ponds, and/or conservation area are reserved as may be shown on the recorded plat. Within these easement areas, no structure, plant or material shall be placed or be permitted to remain if it may hinder or change the direction or flow of drainage channels or slopes in the easements. The easement area of each Lot and all improvements contained therein shall be maintained continuously by the Owner of the Lot, except for those improvements for which a public authority, utility company or the Association is responsible.

5.6 **Temporary Completion Easement.** All Lots shall be subject to easement of ingress and egress for the benefit of the Declarant, its employees, subcontractors, successors and assigns, over and upon the front, side or rear yards of the Property as may

17

be expedient or necessary for the construction, servicing and completion of dwellings and landscaping upon Lots adjacent to the Property, provided that such easement shall terminate twelve (12) months after the date such Lot is conveyed to the Owner by the Declarant.

    5.7    **Easement for Fences, Landscaping and Sprinkler Systems.**

Declarant hereby reserves an easement to erect, install, maintain, repair, landscape and/or replace fences, walls and/or sprinkler systems on the Property which comprise the screening fences on the Property and features associated with such fences.

# ARTICLE 6.

## USE AND OCCUPANCY

    6.1 All Lots and Dwellings shall be used and occupied for single-family residence purposes. No Lot or Dwelling may be used for commercial, institutional or other non-residential purpose if such use involves the attendance or entry of non-residents upon the Lot or otherwise diminishes the residential character of the Lot or neighborhood. This prohibition shall not apply to "garage sales" conducted with prior written consent of the Association provided that no Owner shall conduct more than two (2) garage sales of no more than two (2) days duration each during any twelve (12) month period.

# ARTICLE 7.

## PROPERTY RIGHTS

7.1 **Owners' Easement of Enjoyment.** Every Owner shall have a right and easement in and to the Common Areas and a right and easement of ingress and egress to, from and through said Common Areas, and such easement shall be appurtenant to and shall pass with the title to every Lot, subject to the following provisions:

(a) The right of the Association to establish and publish rules and regulations governing the use of the Common Areas affecting the welfare of Association Members;

(b) The right of the Association to suspend the right of use of the Common Areas and the voting rights of an Owner for any period during which any assessment against his Lot remains unpaid; and for a period not to exceed sixty (60) days for any infraction of its published rules and regulations;

(c) The right of the Association, subject to the provisions hereof, to dedicate or transfer all or any part of the Common Areas, if any, to any public agency, authority or utility for such purposes and subject to the conditions as may be agreed by the Association. No such dedication or transfer shall be effective unless an instrument in writing signed by Owners entitled to cast two-thirds (2/3) of the votes of the Association and by a duly authorized representative of the City has been recorded agreeing to such dedication or transfer;

(d) All easements herein described are easements appurtenant to and running with the land; they shall at all times inure to the benefit of and be binding upon the Owners, and all of their grantees, and their respective heirs, successors, personal representatives and assigns, perpetually and in full force.

19

7.2 **Effect of Declaration.** Reference in any deed, mortgage, trust deed or any other recorded documents to the easements, conditions, restrictions and covenants herein described or to this Declaration shall be sufficient to create and reserve such easements and covenants to the respective grantees, mortgagees, or trustees of said parcels as fully and completely as if those easements, conditions, restrictions and covenants were fully related and set forth in their entirety in said documents.

7.3 **Rezoning Prohibited.** No Lot shall be rezoned to any classification allowing commercial, institutional or other non-residential use without the express, written consent of the Association and Declarant (as long as Declarant owns any Lot subject to this Declaration), which may be withheld in Declarant's sole discretion. Declarant or the Association may enforce this covenant by obtaining an injunction against any unapproved rezoning at the expense of the enjoined party.

## ARTICLE 8.

## USE RESTRICTIONS

8.1 **Nuisances.** No noxious or offensive activity shall be carried on upon any Lot, nor shall anything be done which may be or may become an annoyance or nuisance to the Property, or Lot, or Dwelling, or any part thereof.

8.2 **Development Activity.** Notwithstanding any other provision herein, Declarant and its successors and assigns shall be entitled to conduct on the Property all activities normally associated with and convenient to the development of the Property and the construction and sale of the Dwelling on the Property.

20

8.3    **Temporary Structures.**  No structures of a temporary character, including, without limitation, any trailer, tent, shack, garage, barn, motor home or mobile home or other outbuilding, shall be used on any Lot at any time as a residence, either temporarily or permanently.

8.4    **Signs and Picketing.**  No sign or emblem of any kind may be kept or placed upon any Lot or mounted, painted or attached to any Dwelling, fence or other improvement upon such Lot so as to be visible from public view except the following:

(a)    **For Sale Signs.**  An Owner may erect one (I) sign not exceeding 2' x 3' in area, fastened only to a stake in the ground and extending not more than three (3) feet above the surface of the ground advertising the Property for sale.

(b)    **Declarant's Signs.**  Signs may be erected by the Declarant.

(c)    **Political Signs.**    Political signs may be erected upon a Lot by the Owner of such Lot advocating the election of one or more political candidates or the sponsorship of a political party, issue or proposal provided that such signs shall not be erected more than ninety (90) days in advance of the election to which they pertain and are removed within fifteen (15) days after the election.

In addition to the foregoing, to protect the safety and harmony of the community, no person shall engage in picketing on any Lot, easement, right-of-way or Common Area within or adjacent to the Property, nor shall any vehicle parked, stored or driven in or adjacent to the Property bear or display any sign, slogans, symbols, words or decorations intended to create controversy, invite ridicule or disparagement, or interfere in any way with the exercise of the property rights, occupancy or permitted business activities

21

of any Owner or Declarant.

8.5 **Campers, Trucks, Boats and Recreational Vehicles.** No campers, vans, pickup trucks, boats, boat trailers, recreational vehicles and other types of non-passenger vehicles, equipment, implements or accessories may be kept on any Lot unless the same are fully enclosed within the garage located on such Lot and/or said vehicles and accessories are screened from view by a screening structure or fencing and said vehicles and accessories are in an operable condition.

8.6 **Livestock and Poultry.** No animals, livestock or poultry of any kind shall be raised, bred or kept on any Lot, except that dogs, cats, or other household pets may be kept, provided that they are not kept, bred, or maintained for any commercial purpose.

8.7 **Garbage and Refuse Disposal.** No Lot shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be kept except in sanitary containers. All incinerators or other equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition.

8.8 **Sight Distance and Intersections.** No fence, wall, hedge, shrub planting or other obstruction to view in excess of two feet (2') in height on any corner Lot within the triangular area formed by the street right-of-way lines and a line connecting them at points twenty-five feet (25') from the intersection of the right-of-way lines, or in the case of a rounded property corner, from the intersection of the right-of-way lines. The same sight line limitations shall apply on any Lot within ten feet (10') from the intersection of a street right-of-way line with the edge of a driveway pavement edge or alley right-of-way line. No tree shall be permitted to remain within such distance of such intersections unless the foliage

22

line is maintained at sufficient height to prevent obstruction of such sight lines.

8.9 **Parking in Common Maintenance Area.** No vehicles, trailers, implements or apparatus may be driven or parked in the Common Maintenance Area or on any easement.

8.10 **Commercial or Institutional Use.** No Lot, and no building erected or maintained on any Lot, shall be used for manufacturing, industrial, business, commercial, institutional or other non-residential purposes.

8.11 **Building Standards.** No building shall be erected or maintained on any Lot unless it complies with all applicable standards, including any governmental ordinances.

8.12 **Detached Buildings.** No detached accessory buildings, including, but not limited to, detached garages and storage buildings, shall be erected, placed or constructed upon any Lot without prior consent of the Association or Architectural Control Committee.

8.13 **Fences.** No fence, wall or hedge shall be erected or maintained on any Lot nearer to the street than the building setback lines for the front and side yards. However, in no event shall any fence be closer to a street than the front of any adjacent house. No fence, may be erected on any Lot that exceed six (6) feet in height without prior written consent of the Architectural Control Committee.

8.14 **Antennae, Satellite Dishes and Solar Collectors.** No Owner may erect or maintain a television or radio receiving or transmitting antenna, satellite dish or similar implement or apparatus, or solar collector panels or equipment upon any Lot unless such apparatus is erected and maintained in such a way that it is screened from view of any house erected on a Lot beside, behind or in front of such Lot.

23

8.15 **Chimneys.** All fireplaces flues, smoke stacks, and spark arrectors shall be completely enclosed and concealed from public view in finished chimneys of materials architecturally compatible with the principal finish material of the exterior walls of the Dwelling.

8.15 **Clothes Hanging Devices.** Exterior clothes hanging devices shall not be permitted.

8.16 **Window Treatment.** No aluminum foil, reflective film or similar treatment shall be placed on window or glass doors.

## ARTICLE 9.

## ANNEXATION

9.1 **Annexation by Declarant.** At any time during the initial term of this Declaration, the Declarant may, after first obtaining written consent from a duly authorized representative of the City, annex additional property to this Declaration to be subject to the terms hereof to the same extent as if originally included herein and subject to such other terms, covenants, conditions, easements and restrictions as may be imposed thereon by Declarant. Annexation shall be evidenced by a written Declaration of Annexation executed by Declarant setting forth the legal description of the property being annexed and the restrictive covenants to be applied to such annexed property.

9.2 **Annexation by Action of Members.** At any time the Board may request approval of the membership for the annexation of additional property into the Association to be subject to all of the terms of this Declaration to the same extent as if originally included

24

--

herein. No such annexation shall be effective unless approved in writing by members entitled to cast two-thirds (2/3) of the total votes in both classes of membership and by a duly authorized representative of the City. Any property that is contiguous to the Property to this Declaration may be annexed here to according to the foregoing requirements, provided however, that no such annexation shall be effective without the consent and joinder of the owners of the property to be annexed. Such annexation must be evidenced by a Declaration of Annexation as set forth in Section 9.1 above executed by the parties herein described.

9.3 **No Duty to Annex.** Nothing herein contained shall establish any duty or obligation on the part of the Declarant or any other Member to annex any property to this Declaration and no Owner of Property excluded from the Declaration shall have any right to have such property annexed thereto.

9.4 **Effect of Annexation on Class B Membership.** In determining the number of Lots owned by Declarant for the purpose of Class B Membership status according to Article 2, Section 2.4(b), the total number of Lots covered by the Declaration, including all Lots annexed thereto, shall be considered. If Class B membership has previously expired but the Declarant subsequently obtains ownership to one or more Lots through the annexation of additional property or development of Phase II of the Property, such Class B membership shall be reinstated.

**ARTICLE 10.**

**GENERAL PROVISION**

**10.1 Remedies.** In the event of any default by any Owner under the provisions of the Declaration, By-Laws or rules and regulations of the Association, the Association and any Owner (including specifically Declarant) shall have each and all of the rights and remedies which may be provided for in this Declaration, the By-Laws and said rules and regulations, and those which may be available at law or in equity, and may prosecute any action or other process against such defaulting Owner and/or others for enforcement of any lien, statutory or otherwise, including foreclosure of such lien and the appointment of a receiver for the Lot and ownership interest of such Owner, or for damages or injunction, or specific performance, or for judgment for the payment of the money and collection thereof, or for any combination of the remedies, or for any other relief. No remedies herein provided or available at law or in equity shall be deemed mutually exclusive of any other such remedy. All expenses of the Association in connection with any such actions or proceedings, including court costs and attorney's fees and other fees and expenses, and all damages, permitted by law but, with reference to any Lots financed by FHA insured loans, not in excess of the maximum rate of FHA loans at the time of delinquency, from the due date until paid, shall be charged to and assessed against such defaulting Owner, and shall be added to and deemed part of respective maintenance assessment (to the same extent as the lien provided herein for unpaid assessments), upon the Lot and upon all of the additions and improvements thereto, and upon all personal property upon the Lot. Any and all of such rights and remedies may be exercised at any time and from time to time, cumulatively or otherwise, by the Association or any Owner.

10.2 **Term and Amendments.** This Declaration shall run with and bind the land for a term of twenty-five (25) years from the date this Declaration is recorded, after which time they shall be automatically renewed for successive periods of ten (10) years, unless seventy-five percent (75%) of the votes outstanding shall have voted to terminate this Declaration and the prior written consent has been obtained from the City upon the expiration of the initial twenty-five (25) year period or any extension thereof, which termination shall be by written instrument signed by seventy-five percent (75%) of the Owners and countersigned by a duly authorized representative of the City and properly recorded in the Tarrant County, Texas land records. This Declaration may be amended in whole or part by either, an instrument signed by the Declarant provided the Class B membership is still in effect, or by an instrument signed by Owners constituting not less than seventy-five percent (75%) of the votes of the Association; provided however, if the amendment would amend any portion of the Associations agreements, covenants or restrictions pertaining to the use, operation, maintenance and /or supervision of any facilities, structures, improvements, systems, areas or grounds that are the responsibility of the Association such amendment must be countersigned by a duly authorized representative of the City. Any amendment must be recorded. The Association may not be dissolved without the prior written consent of the City.

10.3 **Severability.** Invalidation of any one of these covenants or restrictions by judgment or court order shall in no way affect any other provision which shall remain in full force and effect.

10.4 **Rights and Obligations.** The provisions of this Declaration and the Articles

27

of Incorporation and By-Laws and the rights and obligations established thereby shall be deemed to be covenants running with the land and shall inure to the benefit of, and be binding upon, each and all of the Owners and their respective heirs, representatives, successors, assigns, purchasers, grantees and mortgagees. By the recording of the acceptance of a deed conveying a Lot of any ownership interest in the Lot whatsoever, the person to whom such Lot or interest is conveyed shall be deemed to accept and agree to be bound by and subject to all of the provisions of this Declaration and the Articles of Incorporation and By-Laws, whether or not mention thereof is made in said deed.

10.5    **Architectural Control Committee.**

(a)    **Appointment**. Declarant shall designate and appoint an Architectural Control Committee (herein called the "Committee") composed of one or more, but not more than three individuals, each generally familiar with the residential community development design matters and knowledgeable about Declarant's concern for a high level of taste and design standards within the Development. The Committee shall use its best efforts to promote and ensure a high level of taste, design quality, harmony and conformity throughout the Property consistent with this declaration. After no

Class B membership exists (or if earlier with the consent of the Declarant) the Association shall designate and appoint the Committee.

(b)    **Successors**. In the event of the death, resignation or removal by Declarant of any member of the Committee, the remaining member(s) shall appoint a successor member. In default of such appointment Declarant shall have full authority to designate and appoint a successor. No member of the Committee shall be entitled to

28

compensation for, or be liable for claims, causes of action or damages arising out of services performed pursuant to this declaration.

(c) **Authority**. No building, fence, wall or other structure shall be commenced, erected, placed, maintained or altered on any lot, nor shall any exterior painting of, exterior addition to, or alteration of such items be made until all plans specifications and a plat plan have been submitted to and approved in writing by a majority of the members of the Committee as to:

(i) quality of workmanship and materials, adequacy of site dimensions, adequacy of structural design, proper facing of main elevation with respect to nearby streets;

(ii) conformity and harmony of the external design, color, type and appearance of exterior surfaces and landscaping in relation to the various parts of the proposed improvements and in relation to improvements on other lots in the Development;

(iii) location with respect to topography and finished grade elevation and effect of location and use on neighboring lots, improvements and drainage arrangements; and

(iv) the other standards set forth within this declaration (and any amendments hereto) or matters in which the Committee has been vested with the authority to render a final interpretation and decision.

The Committee is authorized and empowered to consider, review and approve any and all aspects of construction and landscaping which may, in the reasonable opinion of the Committee, adversely affect the living enjoyment of one or more lot Owners or the general value of Lots in the Development.

(d) **Procedure for Approval.** Final plans and specifications shall be submitted in duplicate to the Committee. The plans and specifications shall show the nature, kind, shape, height, materials and location of all improvements. All roofing materials to be used on improvements constructed on Lots shall be submitted to the Committee for approval. The documents shall specify any requested variance from the setback lines, garage location or any other requirement set forth in this declaration. The Committee is authorized to request the submission of samples of proposed construction materials. At such time as the plans and specifications meet the approval of the Committee, one complete set of plans and specifications will be retained by the Committee and the other complete set of plans shall be marked as "Approved", signed by a majority of the Committee and return to the Owner or his designated representative. If disapproved by the Committee, one set of such plans shall be returned marked "Disapproved" and shall be accompanied by a reasonable statement of the reasons for disapproval, which statement shall be signed by a majority of the Committee. Any modification of the approved set of plans and specifications must again be submitted to the Committee for its approval. The Committee's approval or disapproval, as required herein, shall be in writing. If the Committee fails to approve or disapprove such plans and specifications within thirty (30) days after the date of submission, written approval of the matters submitted shall not be

30

required and compliance with this Article shall be deemed to have been completed.  In case of a dispute about whether the Committee responded within such time period, the person submitting the plans shall have the burden of establishing that the Committee received the plans.  The Committee's receipt of the plans may be established by a signed certified mail receipt.

(e)  **Standards**.  The Committee shall have the sole discretion with respect to taste, design and all standards specified herein.  One objective of the Committee is to prevent unusual, radical, curious, odd, bizarre, peculiar or irregular structures from being built in the Development.  The Committee shall also have the authority to require roof slope, to specify that fireplaces and chimney flues be covered with brick or masonry,  to prohibit the use of light-weight composition roof material, to require the use of anodized aluminum divided light windows, and generally to require that any plans meet the standards of the existing improvements on neighboring lots.  The Committee may from time-to-time publish and promulgate bulletins regarding architectural standards, which shall be fair, reasonable and uniformly applied and shall carry forward the spirit and intention of this declaration.

(f)  **Termination; Continuation**.  The Committee appointed by Declarant shall cease to exist on the earlier of (a) the date on which all the members of the Committee file a document declaring the termination of the Committee, or (b) the date on which residences have been constructed on all Lots.

31

10.6 **Gender Neutral.** All personal pronouns used in this Declaration, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa.

10.7 **Headings.** The headings contained in this Declaration are for reference purposes only and shall not in any way affect the meaning or interpretation of this Declaration.

10.8 **Conflicts.** In the event of conflict between the terms of this Declaration and the By-Laws, rules, regulations or Articles of Incorporation of the Association, this Declaration shall control.

10.9 **Failure of Association to Perform Duties.** Should the Association fail to carry out its duties as specified in this Declaration, the City or its lawful agents shall have the right and ability, after due notice to the Association, to remove any landscape systems, features or elements that cease to be maintained by the Association; to perform the responsibilities of the Association if the Association fails to do so in compliance with any of the provisions of this Declaration, the agreements, covenants or restrictions of the Association, or of any applicable City codes or regulations; to assess the Association for all costs incurred by the City in performing said responsibilities if the Association fails to do so; and/or to avail itself of any other enforcement actions available to the City pursuant to state law or City codes and regulations. Should the City exercise its rights as specified above, the Association shall indemnify and hold the City harmless from any and all costs, expenses, suits, demands, liabilities or damages, including attorney's fees and costs of suit, incurred or resulting from the City's removal of any landscape systems, features or elements that cease to be maintained by the Association or from the City's performance of the aforementioned operation, maintenance or supervision responsibilities of the

do so; and/or to avail itself of any other enforcement actions available to the City pursuant to state law or City codes and regulations. Should the City exercise its rights as specified above, the Association shall indemnify and hold the City harmless from any and all costs, expenses, suits, demands, liabilities or damages, including attorney's fees and costs of suit, incurred or resulting from the City's removal of any landscape systems, features or elements that cease to be maintained by the Association or from the City's performance of the aforementioned operation, maintenance or supervision responsibilities of the Association due to the Association's failure to perform said duties.

IN WITNESS WHEREOF, the Declarant has caused this instrument to be executed on its behalf, attested and its corporate seal to be hereunto affixed as of the day and year first above written.

DECLARANT:

Holland/Man, LTD.
a Texas limited partnership

By: BBE, Ltd., its general partner

By: Gerault Road, Inc.. a Texas corporation and
its general partner

By: _Debbie Hobbs_____
Debbie Hobbs

STATE OF TEXAS        §
COUNTY OF DALLAS      §

The foregoing instrument was acknowledged before me on this 20th day of July ,2001, by Debbie Hobbs, Vice Pres. of Gerault Road,Inc. a corporation on behalf of said Limited Partnership as the General Partner of Holland/Man, Ltd.



GLENDA L. SEASTRUNK
COMMISSION EXPIRES
JANUARY 26, 2004

Glenda L. Seastrunk

33

D201169834
HOLLAND/MAN
2331 GUS THOMASSON #126
DALLAS TX  75228

-W A R N I N G-THIS IS PART OF THE OFFICIAL RECORD--D O  N O T  D E S T R O Y

I N D E X E D -- T A R R A N T  C O U N T Y  T E X A S
S U Z A N N E  H E N D E R S O N -- COUNTY CLERK
O F F I C I A L  R E C E I P T

T O:  HOLLAND/MAN

| RECEIPT NO | REGISTER | RECD-BY | PRINTED DATE | TIME |
|---|---|---|---|---|
| 201306453 | DR2A | LW | 07/20/2001 | 13:52 |

|  | INSTRUMENT | FEECD |  | INDEXED | TIME |  |
|---|---|---|---|---|---|---|
| 1 | D201169834 | WD |  | 20010720 | 13:52 | CK 1113 |

T O T A L :  DOCUMENTS: 01     F E E S:     73.00

B Y:  _____ 

ANY PROVISION WHICH RESTRICTS THE SALE RENTAL OR USE
OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE
IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.